## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DIANE WINTER, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>PAREXEL INTERNATIONAL, LLC,<br><br>        Defendant. | Case No.: 5:25-cv-00831<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Diane Winter ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, here brings this Class Action Complaint against Defendant Parexel International, LLC ("Parexel" or "Defendant"), and states as follows:

## NATURE OF THE ACTION

1.　　Plaintiff brings this action on behalf of herself and all other individuals similarly situated ("Class Members") against Parexel and for its failure to secure and safeguard the personally identifiable information ("PII" or "Private Information") of Plaintiff and Class Members.

2.　　Parexel is a clinical research and pharmaceutical development company based in North Carolina.[1] In the regular course of its business, Parexel is required to maintain reasonable and adequate security measures to protect individuals' PII from unauthorized access and disclosure.

3.　　Upon information and belief, Defendant Parexel used Oracle's E-Business Suite

---

[1] *About Us*, Parexel, https://www.parexel.com/about-us (last visited Dec. 23, 2025).

("Oracle EBS") to collect, manage, and store its current and former employees, clinical trial participants, contractors, consultants, and business partners' Private Information.

4.     In the course of maintaining this information, Parexel possessed extensive amounts of PII, which was not adequately safeguarded and was subsequently exposed to unauthorized third parties in the data breach (the "Data Breach").

5.     Parexel owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their PII against unauthorized access and disclosure. Parexel breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect individuals' PII from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite urgent warnings about how data breaches could severely affect Americans across all economic sectors, companies still fail to make the necessary investments in implementing important and adequate security measures to protect individuals' data.

6.     Parexel required individuals to provide them with sensitive PII and failed to protect it. Parexel was obligated to secure individuals' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Parexel and Plaintiff and Class Members.

7.     As a result of Parexel's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a

concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

8.     Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach. Plaintiff received a dark web monitoring alert from Experian indicating that her personal information was located on the dark web. Since receiving the Data Breach, Plaintiff has experienced an increase in spam emails and has spent time addressing the consequences and risk created by the incident, including reviewing accounts and taking additional steps to protect her identity.

9.     Plaintiff brings this action on behalf of herself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Parexel to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

10.     Plaintiff Diane Winter is a resident of the State of Virginia, whose personal information was compromised in the Data Breach.

11.     Defendant Parexel International, LLC is a limited liability company headquartered in North Carolina that engages in clinical research and pharmaceutical development.[2]

---

[2] Parexel, *Parexel Establishes New Global Headquarters in Raleigh's North Hills Innovation District*, (Sept. 9, 2025), https://newsroom.parexel.com/news-releases/news-release-details/parex

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this controversy under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

13.     This Court has jurisdiction over Defendant because Parexel is based in this District, regularly conducts business in North Carolina, and the acts and omissions giving rise to Plaintiff's claims occurred in and arose from this District.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to this action occurred here, including Defendant's direction and control of the relevant operations from its global headquarters in this District.

## FACTUAL ALLEGATIONS

15.     This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Parexel's willful and reckless violations of her privacy rights. Plaintiff and the other Class Members were individuals who contracted with Parexel.

16.     On October 4, 2025, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII.

17.     This action pertains to Parexel's unauthorized disclosures of the Plaintiff's PII that occurred during the Data Breach.

---

el-establishes-new-global-headquarters-raleighs-north-hills.

18.     Parexel disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of Parexel's failure to safeguard and protect their PII.

19.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Parexel assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

20.     Despite recognizing its duty to do so, Parexel failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

21.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Parexel to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### 1. *The Data Breach*

22.     According to a data breach notification ("Breach Notice"), in October 2025, Parexel experienced a cybersecurity incident involving unauthorized access to systems within its Oracle EBS environment. The incident arose from a previously unknown vulnerability, commonly referred to as a zero-day exploit, that affected Oracle's cloud infrastructure and was publicly disclosed by Oracle on October 5, 2025. As a result of this incident, unauthorized actors gained access to Parexel's systems, exposing sensitive personal information, including full names with dates of birth, Social Security numbers ("SSN"), financial account numbers, and payment card numbers. Parexel is among numerous Oracle customers impacted by this widespread security failure. Given the nature of Parexel's business, and upon information and belief, PII of Plaintiff and Class Members is also likely to have been disclosed in the Data Breach.

23.     Beginning December 17, 2025, Defendant began notifying affected individuals about which individuals and specific data may have been involved in the Data Breach. The Breach

Notice did not specify detailed measures or actions taken by Parexel to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

24.     Plaintiff received the December 17, 2025, Breach Notice advising her that she was impacted by the Vendor Security Incident and that files associated with her employment may have contained her name, date of birth, Social Security number and/or national ID number, and financial account number and/or payment card number (without CVV).

### 2. *The Data Breach was Preventable*

25.     Had Parexel maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Parexel could have safeguarded Plaintiff and Class Members' data. Parexel's lack of security controls and the delayed implementation of improved security measures, which were only put in place after the Data Breach, are inexcusable.

26.     Parexel was at all times fully aware of its obligation to protect individuals' PII and the risks associated with failing to do so. Parexel knew that the information they collect, maintain, and store is highly coveted and a frequent target of hackers.

27.     This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



28.     By 2013, it was reported that nearly one in four data breach notification recipients had become victims of identity fraud.[3]

29.     Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to encryption that allows users and criminals to conceal identities and online activity.

30.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the actors buy and sell it for profit.[4]

31.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a

---

[3] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters.
[4] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

previously known vulnerability."[5]

32.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[6]

33.    In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office on May 26, the firm said it detected unauthorized access to its systems on March 6, with some systems found to be infected with malicious code . . . According to MCNA, the hackers were successful in accessing customer personal information."[7]

34.    In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[8]

35.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

---

[5] Mark Rosanes, *The insurance industry cyber crime report:  recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023), https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[6] *Id.*
[7] *Id.*
[8] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[9]

36.     Another example is the U.S. Department of Justice's seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[10]

37.     Consumer PII remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[11] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[12] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[13]

---

[9]    Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

[10]   *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramifications-identity-theft-fraud-dark-web/.

[11]   Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[12]   Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[13]   *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

38.     Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they can be used for a variety of fraudulent purposes and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[14]

39.     Moreover, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

40.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[15]

41.     Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than, for example, credit card information in a retailer payment

---

[14] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[15] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

card breach, because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

42. The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[16]

43. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media accounts, credit cards, and tax records. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

44. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

45. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

46. Data breaches facilitate identity theft as hackers obtain consumers' PII and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell it to others who do the same.

47. For example, the United States Government Accountability Office noted in a June

---

[16] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[17] The GAO Report further notes that this type of identity fraud is the most harmful because it may take a victim some time to become aware of the fraud and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[18]

48.     The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit from this highly sensitive information.

### 3. *Parexel Failed to Comply with the Federal Trade Commission*

49.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, data security should be factored into all business decision-making.[19]

50.     In 2016, the FTC updated its publication, "*Protecting Personal Information: A Guide for Business,*" which established guidelines for fundamental data security principles for businesses.[20] Among other things, the guidelines note that businesses should properly dispose of

---

[17] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[18] *Id.*
[19] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[20] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.p

personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[21]

51.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested security methods, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[22]

52.     Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### 4.  *The Impact of Data Breach on Victims*

53.     Parexel's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, and dates of birth, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite

---

[21] *Id.*
[22] FEDERAL TRADE COMMISSION, *supra* note 19.

future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

54.     The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

55.     Furthermore, malicious actors often wait months or years before using the PII obtained in data breaches, as victims become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

56.     Given the exfiltration of Plaintiff and Class Members's PII from Parexel, many victims of the Data Breach have likely already experienced significant harm, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

57.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

    a.   84% reported anxiety;

b. 76% felt violated;

c. 32% experienced financial-related identity problems;

d. 83% reported being turned down for credit or loans;

e. 32% reported problems with family members as a result of the breach;

f. 10% reported feeling suicidal.[23]

58. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

a. 48% reported sleep disturbances;

b. 37.1% reported an inability to concentrate/lack of focus;

c. 28.7% reported they were unable to go to work because of physical symptoms;

d. 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

e. 12.6% reported a start or relapse into unhealthy or addictive behaviors.[24]

59. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the

---

[23] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter .org/wpcontent/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.
[24] *Id.*

damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

60.     The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, a harm recognized by courts as an independent form of harm.[25]

61.     Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

62.     As a result of the Data Breach, Plaintiff and Class Members have already incurred mitigation time and burden, including time spent changing passwords, responding to increased spam emails, and addressing dark web alerts. Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.  The unconsented disclosure of confidential information to a third party;

b.  Unauthorized use of their PII without compensation;

c.  Losing the value of the explicit and implicit promises of data security;

d.  Losing the value of access to their PII permitted by Parexel without their permission;

---

[25] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

63. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims reported spending an average of 7 hours resolving issues related to identity theft or fraud.[26]

64. Plaintiff and Class Members place significant value on data security. According to a survey conducted by cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider

---

[26] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

that offers better data security. Seventy percent of consumers would be less willing to provide personal information to organizations that have suffered a data breach.[27]

65. Plaintiff and Class Members have a direct interest in Parexel's promises and duties to protect PII, i.e., that Parexel would **not increase** their risk of identity theft and fraud. Because Parexel failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and the present and continuing increased risk of harm caused by Parexel's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for Parexel's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

66. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through Parexel's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law principles of damages, authorizing recovery of rental or use value. This measure is

---

[27] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

67.     Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as Parexel continues to hold their PII.

## CLASS ACTION ALLEGATIONS

68.     Pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and the following proposed class (collectively, "the Class"), defined as follows:

**Nationwide Class**
All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

69.     Excluded from the proposed Class are any officer or director of Parexel; any officer or director of any affiliate, parent, or subsidiary of Parexel; anyone employed by counsel in this action; and any judge to whom this case is assigned, her or her spouse, and members of the judge's staff.

70.     **Numerosity:** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Parexel's own records.

71.     **Commonality:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Defendant engaged in the wrongful conduct alleged herein;

b. Whether Defendant's inadequate data security measures were a cause of the Data Breach;

c. Whether Defendant owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether Defendant negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

72. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, both in quantity and quality, to the numerous questions that dominate this action.

73. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Defendant's misconduct affected all Class Members in the same manner.

74. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation,

and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

75. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation could lead to inconsistent or contradictory judgments, increasing delays and costs for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and Class Members)**

76. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

77. Plaintiff and the Class Members entrusted Parexel, as entities that collected, processed, stored, and maintained their PII in connection with clinical research operations, employment relationships, and related business activities, with the protection of that Private Information.

78. By collecting, maintaining, and utilizing Class Members' Private Information within Parexel's systems and within Oracle's managed software environment, Defendant owed

Plaintiff and the Class Members a duty to exercise reasonable care to secure and safeguard the systems under their respective control, and the Private Information stored therein, to prevent unauthorized access, disclosure, theft, and misuse. This duty included the obligation to implement reasonable processes to detect security breaches in a timely manner and to take appropriate steps upon discovery of such breaches.

79.     Defendant owed a duty of care to Plaintiff and the Class Members to implement and maintain data-security practices consistent with industry standards and applicable legal requirements, and to ensure that all systems, networks, and personnel involved in handling Private Information adequately protected such information from unauthorized access and disclosure.

80.     Defendant's duties of care arose from the special relationship between Defendant and Plaintiff and the Class Members, who provided their confidential Private Information to Defendant in connection with clinical research operations, employment relationships, contractual engagements, financial transactions, and related business activities. This special relationship is recognized by common law and laws governing unfair and unreasonable commercial practices.

81.     Defendant additionally owed a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair practices in commerce, including the failure to use reasonable measures to protect sensitive and confidential data.

82.     Defendant further owed a duty to protect confidential Private Information in accordance with generally accepted industry standards applicable to entities that collect and maintain sensitive personal and financial data.

83.     Defendant breached its duties and was negligent by failing to use reasonable measures to protect Class Members' Private Information. Such acts and omissions include, but are

not limited to, the following:

      a.      Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Class Members' Private Information;

      b.      Failing to adequately monitor the security of the systems they controlled or utilized;

      c.      Failing to regularly assess and update security safeguards to address known risks;

      d.      Allowing unauthorized access to Class Members' Private Information;

      e.      Failing to timely detect that Class Members' Private Information had been accessed or compromised;

      f.      Failing to take reasonable steps to mitigate foreseeable harms resulting from the Data Breach; and

      g.      Failing to secure system endpoints and workstations used to access Oracle's platform, even after the exploitation of security vulnerabilities.

84.     It was reasonably foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiff and the Class Members. The risk of data intrusion and misuse of Private Information was well-known in the industry at the time of the breach.

85.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer damages, including but not limited to loss of privacy, increased risk of identity theft and fraud, out-of-pocket losses, time and expenses incurred to mitigate the effects of the Data Breach, and other consequential damages.

86.     Defendant's negligent conduct is ongoing in that Defendant continues to retain Plaintiff's and Class Members' Private Information without having implemented sufficient and reasonable safeguards to adequately protect it from future compromise.

87.     Plaintiff and the Class Members are entitled to compensatory and consequential damages in an amount to be proven at trial.

88.     Plaintiff and the Class Members are further entitled to injunctive and equitable

relief requiring Defendant to, at a minimum: (i) implement and maintain reasonable data-security systems and monitoring procedures; (ii) submit to regular, independent security audits; and (iii) take appropriate remedial measures to safeguard Class Members' Private Information from future breaches.

## COUNT II
## NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

89.     Plaintiff realleges paragraphs 1 through 75 as if fully set forth here.

90.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

91.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and comply with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable harm.

92.     Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

93.      Plaintiff and Class are within the class of persons that the FTC Act was intended to protect.

94.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class.

95.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

96.     Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

97.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

98.     Plaintiff realleges paragraphs 1 through 75 as if fully set forth here.

99.     When Plaintiff and Class Members provided their Private Information to Parexel in connection with clinical research operations, employment relationships, contractual engagements, financial transactions, and related business activities, and when Parexel, in turn, transmitted that information to Oracle for storage and management within Oracle's software environment, Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to reasonably safeguard that information.

100.     Defendant solicited, offered, and invited Plaintiff and Class Members to provide their Private Information as part of Parexel's regular operations used to manage such information. Plaintiff and Class Members accepted Defendant's offers and, in reliance on them, provided their Private Information to Defendant.

101.     In entering into these implied contracts, Plaintiff and Class Members reasonably understood and expected that Defendant' data-security practices would comply with applicable laws and regulations and with generally accepted industry standards for the protection of sensitive information.

102.     Plaintiff and Class Members provided something of value to Defendant, including but not limited to wages, labor, services, professional time, participation in clinical research activities, and the use of their personal information, with the reasonable expectation that Defendant would use a portion of those resources to implement and maintain adequate data-security measures. Defendant failed to do so.

103.     Plaintiff and Class Members would not have entrusted their Private Information to Defendant absent Defendant's implied promise to take reasonable measures to protect that information from unauthorized access and misuse.

104.     Plaintiff and Class Members would not have entrusted their Private Information to Defendant absent Defendant's implied promise to monitor their computer systems and networks and to maintain reasonable data-security safeguards.

105.     Plaintiff and Class Members fully performed, or substantially performed, all obligations required of them under the implied contracts with Defendant.

106.     Defendant breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable measures to safeguard and protect their Private Information.

107. As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class Members suffered damages as alleged herein, including the loss of the benefit of their bargain.

108. Plaintiff and Class Members are entitled to recover compensatory, consequential, and nominal damages resulting from Defendant's conduct.

109. Plaintiff and Class Members are also entitled to injunctive and equitable relief requiring Defendant to, including but not limited to: (i) strengthen their data-security systems and monitoring procedures; (ii) submit to regular, independent security audits of those systems and procedures; and (iii) take immediate and appropriate remedial actions to safeguard Class Members' Private Information from future compromise.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and Class Members)**

110. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

111. Defendant received monetary and other valuable benefits from Plaintiff and Class Members, including but not limited to wages, labor, services, and the use of their personal and information, in connection with Parexel's clinical research operations and related business activities.

112. Defendant also received the benefit of collecting, using, monetizing, and retaining Plaintiff's and Class Members' Private Information in connection with those operations.

113. Plaintiff and Class Members conferred these benefits on Defendant with the reasonable expectation that Defendant would use a portion of the value received to implement and maintain reasonable data-security practices to protect their Private Information.

114. Defendant knowingly accepted and retained these benefits under circumstances that made it inequitable for them to do so without paying fair compensation for the protection and

security of Plaintiff's and Class Members' Private Information.

115. Defendant failed to implement reasonable data-security measures despite retaining the benefits conferred by Plaintiff and Class Members, thereby unfairly retaining monies and other value that should have been used to safeguard Private Information.

116. As a direct and proximate result of Defendant's wrongful conduct, Defendant was unjustly enriched at the expense of Plaintiff and Class Members.

117. Under principles of equity and good conscience, Defendant should not be permitted to retain the benefits conferred upon them without providing restitution to Plaintiff and Class Members.

118. Plaintiff and Class Members are entitled to restitution, disgorgement, and all other equitable relief as the Court deems just and proper.

**COUNT V**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiff and Class Members)**

119. Plaintiff realleges paragraphs 1 through 75 as if fully set forth herein.

120. Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

121. Defendant owes a duty of care to Plaintiff and Class that require it to adequately secure Plaintiff's and Class's PII.

122. Defendant failed to fulfill their duty of care to safeguard Plaintiff's and Class's PII.

123. Plaintiff and Class are at risk of harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

124. Plaintiff, therefore, seeks a declaration that (1) Defendant's existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect

customers' personal information, and (2) to comply with their explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiff and Class for a period of ten years; and

h. Meaningfully educating Plaintiff and Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against Parexel, as follows:

1. For an order certifying the Class and appointing Plaintiff and her counsel to represent the Class;

2. For an order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII belonging to Plaintiff and Class;

3. For injunctive relief requiring Defendant to:

   a. Engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

   b. Engage third-party security auditors and internal personnel to run automated security monitoring;

   c. Audit, test, and train its security personnel regarding any new or modified procedures;

   d. Segment their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

   e. Conduct regular database scanning and security checks;

   f. Routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

   g. Purchase credit monitoring services for Plaintiff and Class for a period of ten years; and

   h. Meaningfully educate Plaintiff and Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

4. An order instructing Defendant to purchase or provide funds for credit monitoring services for Plaintiff and all Class members;

5. An award of compensatory, statutory, nominal and punitive damages, in an amount to be determined at trial;

6. An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

7. An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law; and

8. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands this matter be tried before a jury.

Dated: December 26, 2025

Respectfully submitted,

*/s/ J. Hunter Bryson*
J. Hunter Bryson (NC Bar No. 50602)
Scott C. Harris (NC Bar No. 35328)
**BRYSON HARRIS**
**SUCIU & DEMAY PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
P: (919) 539-2708
hbryson@brysonpllc.com
sharris@milberg.com

*Counsel for Plaintiff and Putative Class*